May it please the Court, my name is David Buecke. I am counsel for Appellant Edward Abramov in this matter. I'd like to reserve approximately four minutes of my time for rebuttal. You keep track and we'll try to help you. Thank you. I will, of course, be happy to respond to any particular questions the Court may have. To give some semblance of the structure of how I thought I would proceed, I will address the issue of the procuring false citizenship count primarily first and also touch upon the severance issues. Before doing so, I thought I might anticipate a question the Court might have, namely, whether or not, if the Court were not to reach the question of the assertion of ineffective assistance of trial counsel below, what would the impact of that determination be upon the other issues before the Court? And I have analyzed that question as follows, Your Honors. Turning to the issues of severance that we have argued, we have argued two issues of severance, that the Court improperly denied Appellant's motion for severance of counts under Rule 8. And our analysis of that is that trial counsel's failure to renew the motion for severance has no effect on that issue. Because of this Court's decision in United States v. Terry, which I've extensively discussed in the brief, and the Court specifically held in Terry that a Rule 8a motion of this type does not need to be renewed in order to be preserved on appeal. So there would not be a shift in standard on appellate review, and therefore the Court would not need to reach the question of ineffective assistance of counsel in order to consider that issue. And, of course, that makes sense since a Rule 8 motion is inherently more related to the pleadings themselves than what may transpire at trial in terms of the evidence. Now, counsel also filed a timely motion for severance under Rule 14. And we are, he argued, and I reassert in this argument, there's a fundamental unfairness of trying these two cases, these two groups of cases together, the Medicare health care fraud and money laundering counts with the false citizenship claim because of the sort of factual inevitable prejudice that flows from considering this is a man who supposedly defrauded the United States to obtain a citizenship, now is defrauding Medicare. Counsel, both in their opening statement and in their closing argument, made pointed references to the impact of the Medicare crime on. Now, if this were solely a case involving false citizenship. Yes. I think the government would have to prove the Medicare fraud. Absolutely. So why do you get severance? Because the converse is not true. To prove the Medicare fraud, they would not have to prove any of the false citizenship. Well, I understand that. And so it's a prejudice, Mr. Romoff's trial. Well, I understand that he doesn't want it and that he's disadvantaged by it. Yes. But the prejudice question is such great disadvantage as to be prohibited. That's right. And given the relationship of the two claims, I'm not sure I understand quite why it is forbidden disadvantage, that is to say prejudice. Well, I think it is a factual matter. It struck me as highly prejudicial when the prosecutor is making these arguments about the tax system. You have an immigrant. It just does. So your argument is that the government has to try first the false citizenship and in that case has to establish the illegality of the Medicare and then file a separate suit establishing what they've already established in the first suit, that is to say the illegality of the Medicare? Well, I think the trial counsel had an excellent suggestion that the court rejected below, which is that there be a bifurcated consideration of the two issues, that the Medicare fraud be tried first. And if the defendant was found not guilty, there would be no need to proceed on the citizenship claim. If the defendant was found guilty, the same jury could consider the false citizenship claim. They would then have these facts brought before them. That did not occur. Do you have a case? I mean, I understand perfectly why the defense counsel wants that. I mean, I agree with you totally that Mr. Obama is disadvantaged in the proceeding by going forward in the way in which he was required to go forward. Do you have a case that's comparable to this one? I was not able to find such a case on the issue of prejudice. As the Court knows, I have cited a great number of cases dealing with the strict procedural requirements which must accompany consideration of a false citizenship claim because of the impact upon those claims. And I would argue that those considerations should also govern the claim of prejudice in this case. But to turn, as I was beginning to state, the plain, because that motion was not renewed, ordinarily the plain error rule would need to be applied on appeal. However, in this case, the government has, and I believe properly conceded, that a motion to renew the severance motion would have been futile. The government argues that position, of course, in justifying or defending against the assertion of ineffective assistance of counsel. But the government has correctly cited to such cases as United States v. Kaplan from this Court, which hold that if a motion of this type at the end of a trial would be a needless formality, there is no need for it to be renewed. And I would argue that that is exactly the situation that exists with respect to the severance motion. Equally important, I would argue that the Court can and should consider the issue of the insufficiency of the evidence on the false citizenship count because the renewal of a motion under Rule 29 would have also been a needless formality. And that, therefore, that issue was not waived by trial counsel below. The one issue that I would concede the Court is required to consider differently, unless it reaches the issue of ineffective assistance of counsel, is the jury instruction on the knowing element that relates to the false citizenship count. I can understand. I have not found a case that says that that is a mere technicality, and I think that counsel could have appropriately offered alternate instructions, particularly on the issue of knowingly, that would have clarified a situation before the Court that I believe resulted in an erroneous jury instruction. So with that backdrop, I'd like to turn, if I might, to Count 49. And I think it is helpful to state just a couple of very preliminary things. With all respect to my learned colleagues on the other side, I believe the record reflects that the immigration false citizenship count was rather sloppily drafted. It incorporated, purported to incorporate as part of the reasoning, 34 counts of the indictment which had not taken place in February of 1998, when Mr. Abramoff appeared for his third interview before the Immigration Service. There was no clarity regarding this clear anomaly in the record by any of the parties below. But you have kind of a shotgun charge that says we incorporate everything else we've alleged here, and that's why Mr. Abramoff's citizenship should be taken away. The second thing is that, and I have cited these cases in my brief, there really are an extraordinary amount of law stating consistently that very strict procedural safeguards must be observed before a person may be convicted on this statute. And that is because the statute itself has such serious consequences. Those consequences are starkly illustrated in this case. And there are cases from the Supreme Court, Schneiderman, Chount, other cases, I won't repeat the language, but they're set, I've quoted, I have the applicable quotes in my brief that say we must be very, very careful before we drop this kind of nuclear bomb into someone's life and result in their being deported. In this case, Mr. Abramoff, an Armenian by extraction, had fled his native Azerbaijan because of all the ethnic violence going on in that country. And so, and this court, contrary to the assertions of my opponent, has indeed recognized the significance of following those civil standards in a criminal case. The United States argues, well, this is a criminal case, they don't apply, and their case is from the McCarthy era. Well, Your Honors, in the United States of Puerta, which is cited in my brief, considered a different issue, the question of materiality for a case of this sort, and determined that the court would specifically look to the civil cases governing the standard of materiality under denaturalization proceedings. Even so, as the court pointed out in that case, the court recognized that it would result in, I believe the court's language was, an anomaly. So if the issue of materiality requires that the court take a careful look at whether the evidence is sufficient to support issues of knowledge, for example, materiality, it applies to the issues that are before the court in this matter, I would argue. Now, what is the record here? And the counsel has devoted an immense amount of time in his brief, and perhaps appropriately so, to the record of the proceedings regarding Mr. Abramoff's involvement in health care fraud. But the evidence that my client falsely submitted a claim to the Immigration Service, which should result in his conviction and, therefore, denaturalization, consists of one barely intelligible tick mark on an immigration form that is, I believe, set out in the excerpt of record. It's a tick mark accompanied by testimony. A tick mark accompanied by testimony. That's correct, Your Honor. And one other bit of testimony that I would argue is not entitled to any weight at all, the co-defendant's gratuitous comment that, of course, he knew he was committing health care fraud at the time. Returning to the tick mark, the facts, as Your Honor understands, are as follows. Mr. Abramoff was first interviewed to become a citizen in 1996, well before this alleged scheme was said to have begun. He was then re-interviewed on March 24, 1997, again, before the scheme is alleged to have occurred. He is then finally re-interviewed on the day of his citizenship, and the immigration agent testified, yes, as a matter of routine, she did ask that question and gave that answer. And although, as trial counsel pointed out, the question itself went to the key issue of moral torpitude, and when one looked at her notes relating to that issue, there was nothing in the file to reflect it. So it's a tick mark accompanied by testimony, but it's a very thin read, I would argue, and one that one must approach cautiously considering what's at stake. The other problematic concern. But the jury appears to have believed the testimony plus the tick mark. That's correct. That's correct. And I argue that they should not have done so and that that was not rational for them to have done so. But then we then turn to the question of knowledge itself. This Court, recognizing, again, the importance of compliance with strict procedural rules in this type of area, has carefully examined the mental state requirement for a conviction under this statute, and I believe the Pasilis-Gayton case. And at the one hand, the Court rejected the kind of cheek, Retzlaff analysis that willfulness needs to be established. At the other hand, the Court, resounding, really, rejected the government's argument that we should use a kind of public welfare knowledge and said that the mens rea requirement must be proven and that it's important. In fact, there's a footnote talking about denaturalization being one of the important arguments. So our argument is, Your Honor, that given what must be required to establish knowledge, that it's far more than what was set forth in the jury instruction in this case. They have to show some kind of intentional act that you are deceiving the Immigration Service when this occurred. And I guess what troubles me in this case, having been in this area of practice in criminal law and federal courts for most of my professional life, is that there's something very unsettling about a person being convicted and therefore deported when the question is, Have you ever committed a crime for which you have not yet been arrested? When I first took this appeal, I thought, There must be some constitutional challenge to this that has occurred over the years. It just has this unfeel, vagueness. And the courts have recognized that. You know, there is a case where someone had a prior child abuse conviction or acts, and they said it would be impossible to forget something like that. But there's another case where it involves a tax violation, I think the Singh case, although it's a civil case, and they said, You know, this just isn't enough. And so my argument, Your Honor, is that one has to proceed very, very cautiously in this area, and the court has recognized that. I'd like to talk just very briefly on the issue of severance, which we started the argument and then reserved the rest of my time. I think this case was misjoined under Rule 8. I think it is analogous, although there are differences, it is analogous to the Terry case, which talked about the joinder of gun offenses and drug offenses. And what has held this together in the government's view is the notion of if the offenses are connected together. But connected together means something more than simply overlapping proof. As I read the cases, the cases that talk about connected together are talking about essentially unitary schemes. So in this Court's decision in United States v. Portak, that was an antitrust case in which the President or an officer, Mr. Wolf, had given perjurious testimony before the grand jury. And the Court found that those cases were properly joined because the commission of the perjury and the antitrust violation were part of an overall two aspects of a unitary scheme. Now, the government argues, attempting, recognizing I think the flaw in their argument, the government argues that really what you have in this case are two instances of Mr. Abramoff deceiving the government. But that's not what was presented to the Court before, below. And moreover, the government argues that they are all part of a common scheme, and that under the common scheme aspect of Rule 8, joinder would therefore have been proper. But the Court did not consider whether joinder was proper under the common scheme component of Rule 8, below, nor did the government argue that it was. So really, when one looks for ties that can bring these cases, these two counts together, they really do not exist. The only thing that does exist is the convenience of the evidence. And I would concede that it would be more convenient for the government not to have to try this case twice. But the law is the law on Rule 8, and there are consequences to that. That's why Rule 8 exists, and I believe my client was prejudiced. I'll reserve my remaining time for rebuttal. Thank you. And now we'll hear from the government. May it please the Court. My name is Peter Winn for the government. The appeal today involves six issues. Five of those issues address the question of the immigration fraud count, and I'd like to focus on those primarily in my argument. I'd like to address the sufficiency of the evidence question first, because I think the Mr. Bromoff has failed to identify some key items in the record to support the, well, really explain why the jury convicted him of knowingly misrepresenting his past criminal history to the INS. Now, in June of 1997, several months before his INS interview, Mr. Bromoff broke into the offices of A&P, which was a rival durable medical equipment company being run for a fraud. He stole the key and the password from his girlfriend's daughter and broke into those offices, stole from those offices documents and records, basically a roadmap to commit a Medicare-Medicaid fraud, took those documents home to his father's apartment where he was living at the time, studied those for a week, and then on his own initiative started the EGA fraud, which, of course, he participated with his girlfriend in doing. So the jury had the break-in, the statements also by Mr. Bromoff that he had learned how to commit this type of a fraud, that is to charge for the expensive stuff and give the patients the cheap stuff in the former Soviet Union. So we have that background. We also have the testimony of the patients, and the testimony of the patients was quite extensive. Every single patient, save one that's referenced in the government's brief, were all pre-February 18th, 1998, frauds committed with respect to those Medicare and Medicaid patients. In October of 1997, Bromoff submitted a bill to Medicare for Mikhail Soltys, and he testified he was an A&P patient. An A&P patient, he testified he'd never met Mr. Bromoff. And Mr. Bromoff nevertheless used his A&P records to bill Medicare and Medicaid for expensive medical equipment, which as of February 18th, 1998, Mr. Soltys had never seen, and Mr. Bromoff had never ordered from any medical equipment dealer. The other patients testified similarly. Greta Begirava, Ivan Lech, Vladimir Galiant, all of these patients are pre-1998, pre-February of 1998. They're all in the fall and the winter of 1997. And they're all testifying that they went into EGA. Mr. Bromoff gave them coffee makers or blankets or mixers or shoes. And in return, they would give Mr. Bromoff their Medicare and Medicaid numbers. And then Mr. Bromoff turned around and billed for expensive medical equipment that they didn't get. Now, these patients also testified that they signed blank delivery tickets. And those are dated, and they're in the record. And those are dated pre-February 1998, contemporaneous with the time they said that they had, you know, visited with Bromoff and gotten these presents. And those blank delivery tickets were then used to support Bromoff's defense to say that the patients actually got the equipment. He would actually, the testimony was he'd fill in those delivery tickets with the expensive items of equipment, which, of course, he hadn't even ordered yet. So based on this record, Mr. Bromoff says the only evidence the government can point to is his sort of conclusory statement of his girlfriend. Well, that's not correct, because there's a mass, massive evidence of his extensive involvement in this crime prior to February 18th of 1998, when he had his INS interview. And when you understand the nature and the extent of the scheme, it's, you know, we have patients being taken to doctors who don't speak Russian. We've got patients that don't speak English. And we've got an interpreter in the middle convincing the doctors to write prescriptions for the expensive medical equipment. This is a very exploitative scheme, and it's very, very, well, it's basically impossible for anybody to have been involved in that scheme and not have been aware that they were committing a crime in so doing. And that's what the jury had in front of them when they evaluated the question that was asked Mr. Bromoff by Brenda Barnett. Now, Brenda Barnett was an INS examiner, and she testified not simply that it was her regular course of business, but she testified her recollection was refreshed. She recognized his photo from the application form. And she went through each and every question on the application form with Mr. Abramoff. Granted, the only documentary record of that is a checkmark, but she testified that was her regular procedure. And those checkmarks were in separate color so you know it's hers. And Mr. Abramoff, when she went through that form with him, corrected five different of the answers, five different answers, to indicate that he was aware that that was to update them to the date February 18th. And that last interview was on the day he was sworn in to be a citizen. Is that correct? Yes, that is correct. Is it customary to interview all people on the day they're being sworn in again? I think it generally takes place that way. They do one last interview to update the form, and then they'll swear them in if everything's fine. So it's a double check to make sure that the information is update. Now, Mr. Abramoff. Let me back up. The reason I'm asking this question is I'm not familiar with the naturalization ceremonies here. I've seen them many times in San Francisco. There are a thousand people. Well, I think it's unlikely that you can interview a thousand people on the day of the naturalization ceremony, or even probably in the week before that. That's actually a good question. Incidentally, I don't know exactly what the statistics are, but I went through one of these cases about a year ago in another matter and learned that the local practice appears to simply swear them in after their interview and have the district director swear them in. I know that in other jurisdictions, and frankly, it's a disappointment because I think the ceremony is quite special. You have a federal judge come in and usually give a speech. But at least here, I think the practice appears to be just to swear them in after their last interview. And there's no conflict in the testimony that this interview took place. Now, he did go through and update and correct that form. He knew it needed to be up to date. He updated other information on the form. He signed it as of February 18th. And then there's a separate certification on that form, which he signed, indicating that it's up to date as of February 18th. So I think the jury, when asked the question, turning to the question of the jury instruction, they were asked whether he knowingly misrepresented his criminal history to the INS. Now, the actual jury instruction, which is being challenged here, and I think that it's useful to read the jury instruction carefully, is on a fair reading, on a fair reading of this jury instruction, accurate. The first sentence is, First, on or about February 18th, 1998, the defendant procured citizenship contrary to the immigration laws of the United States by making a false statement on an amended sworn application for naturalization or during the sworn interview with the INS. Now, you read that, and it seems that what he is being accused of doing there is making a false statement, basically procuring citizenship by making a false statement. Now, the next sentence is, The defendant did so knowingly. A fair reading of that jury instruction knowingly refers to by making a false statement. Now, of course, the jury instruction was not objected to at the trial court, and I was trial counsel, as was Mr. Lord here. But the question is whether the charge could be – the question before this Court is not whether the charge could be more artfully drafted. The question is whether the jury was misinformed, whether the likelihood of – and the review, of course, is on a clear error review. Now, when I argued the case to the jury in closing argument, I made it very clear that the jury had to find that it was not simply a false statement, because you can make a false statement accidentally through honest mistake. The jury had to find that he knowingly lied, that he knew what he was saying was false, and he lied about it. And based on the record in this case, I think the jury had more than ample evidence on which they could have found that, in fact, it was a knowing misrepresentation of a fact. Now, Mr. Bromoff has raised a question about the fairness of that question itself. In other words, he's saying there's something unfair about asking someone, have you ever been arrested – I mean, have you ever been – have you ever committed a crime for which you haven't been arrested? And he quite rightly points out that the Supreme Court has addressed that particular question and has not found the question itself to be improper, but has imposed a fairly high standard of review. You have to prove that someone knowingly made a misrepresentation of a material fact. And that's what Pesillas-Gaetan holds. And Pesillas-Gaetan holds just that the government has to prove not only the false statement, but that the false statement was knowingly false, and it was material. And they have to prove that beyond a reasonable doubt. And that's the way the jury was instructed. And that's a very, very strict standard of review that is applied to this kind of question. And it's also important to know that if he had answered that question yes, he would not automatically have been disqualified for citizenship, because the INS then opposes in their rules a five-year period, a crime that doesn't go to moral turpitude, but is within the five-year period. Well, you have to wait five years. If it goes to moral turpitude, it will disqualify you for citizenship. But this is a benefit that the government is giving a non-citizen. And asking that type of a question is appropriate, given the fact that the government is giving a very valuable benefit. Now, I'd like to address severance and the two issues on severance. No, I'm sorry. The two issues on severance, the Rule 8 severance and the Rule 14 question. Now, the severance under Rule 8 is the one that's most important. Thank you, Your Honor. This Court in Freedman, as well as the Supreme Court precedent, holds that Rule 8 is to be broadly construed to permit joiner. And there's no question that the evidence of the immigration fraud and the evidence of the health care fraud were overlapping. And, in fact, the issues in the trial court, they were completely overlapping. Mr. Bramoff's defense in the trial court, by the way, the argument here about whether or not knowing he was, the government showed that he was knowingly making a false statement, that was not the focus of the trial court. Certainly, there's certainly sufficient evidence to support it. But at the trial court, Mr. Bramoff's defense on the immigration count is that he hadn't committed the health care fraud. So the prejudice, given that type of defense, is nonexistent. As this Court correctly pointed out, you have to prove the health care fraud in order to prove the immigration fraud. And he, Mr. Bramoff argues that, but it doesn't go the other way. But the question for this Court, and it's not really a Rule 8 question. The Rule, it's clearly properly joined because of the overlapping evidence. And there's a lot of case law to support that. The question for this Court on the rule, on the severance question, is a Rule 14 question. And it goes to prejudice. Where is the prejudice from trying these two counts together? Now, there's no prejudice as to the health care, as to the immigration count, because the jury is going to hear all of that evidence anyway. The only prejudice that you can find goes the other way, goes to the argument that he's making here today for the first time, that the government sort of portrayed him with this sort of ethnic stereotype, which frankly is nowhere, nowhere supported in the record. And as Terry Kellogg said in the trial court, he said it was a clean trial and a good trial. And I doubt he would have said that if he had experienced the kind of prosecution that is being characterized here today now. However, the question is prejudice. And we look at the question of prejudice as to the health care fraud count, not the INS count. And on that prejudicial question, he's not opposing, he's not here today challenging his conviction for health care fraud. That's not before he's, basically that's over. So he's saying that the government unfairly convicted him of a health care fraud because we were able to put in evidence about an immigration fraud. But he's not challenging the health care fraud issue. But he's still saying there's prejudice. And I think there's some inconsistency in that position. The second issue is, as to prejudice, and I think that's the important place to focus, is that prejudice was not an argument made to Judge Rothstein. Judge Rothstein, let's just say, runs a pretty tight ship and has a pretty fair sense of a fair trial. Now, the jury was instructed appropriately. This Court and the Supreme Court has held that there are other solutions to severance, other solutions other than severance, among them being trusting the jury to bifurcate, not to, I'm sorry, trusting the jury to compartmentalize the evidence and follow the instructions. So we have the usual procedural safeguards from prejudice. We have Judge Rothstein's, frankly, fairly careful oversight of counsel in how we tried this case. And trial counsel said it was a clean trial. He did not experience this experience that's taking place on appeal. But if you think about the question of prejudice just with respect to this last issue, which is, what is the prejudice as to even health care fraud? If he was innocent of the health care fraud, then he would be completely free on any question of opprobrium on the INS side because he would have told the INS the truth. There wasn't any additional negative pejorative-type information that was coming in from the INS side. All it was was if he committed the health care fraud, he defrauded the INS. It's as simple as that. If he didn't commit the health care fraud, he couldn't have knowingly misrepresented anything to the INS. So at the end of the day, we don't have prejudice either way. And the perception of trial counsel, both by the government as well as by the defense with Mr. Kellogg's statement, is that this was a straightforward case. Kennedy. Is there prejudice in the undue prejudice sense? I would say there's very, very little prejudice, if any prejudice. And when you think it through in terms of this record, it's difficult to find it. The argument, the only argument we've heard is this ethnic stereotyping point. And that's not citation to the record about that. And I'd be very surprised if Judge Rothstein didn't lynch any lawyer who ever tried to do that kind of stuff. It seems to me this evidence was prejudicial. The question is was it unduly prejudicial. Isn't it? Well, it's hard for, well, with all due respect, the prejudicial nature, if it were prejudicial at all, and I'm less convinced, but even assuming prejudice, it goes to the health care fraud count. And he's not challenging that here today. So that would be my first point. And I had missed this. He's appealing only his conviction on the citizenship count. That's correct. He's not appealing his conviction on the health care count at all. That's correct, Your Honor. I want to hear that from him. Okay. But I'm not quite focused on that. Right. And the second point would be it's not unduly prejudicial because of the precedent that suggests that there are other intermediate ways in which those kinds of prejudicial questions can be addressed. Now, finally, before I end, and I only have just a few more, a few more seconds, the — I'm not sure the Court wants me to address the abuse of trust enhancement. The cases are cited, and we have handed up to the Court two additional cases that hold basically you don't even have to be a doctor on that issue. Do we need to — is that a Blakely problem? Blakely hasn't been briefed by Mr. Abramoff. But if the Court would appreciate that, we'd be happy to mutually submit briefs on that question after, of course, the Supreme Court gives us some guidance. So as you stand here now, you don't have a position one way or the other on Blakely? As I stand here today, I don't have a position. I haven't had a chance to think through the Blakely issues in this case because they haven't been raised by Mr. Abramoff. But we certainly would be more than happy to address that in supplemental briefing after the Supreme Court has ruled, and I would be very open to address that. Blakely was decided after completion of briefing in this case? Yes. Yes, Your Honor. If there's nothing further, I'll sit down. Thank you. May it please the Court, first to answer Your Honor's question, we are asking that all counts be reversed and the severance issue and ineffective assistance of counsel accompanying that is one reason. We've stated that in the conclusion of our brief. So there's no question that we are seeking reversal of all counts. Certainly I have put a great deal of effort into the false citizenship claim because of its importance. Just a couple of comments. Trial counsel is a friend, an excellent lawyer, a fine man, does excellent work. But his comments about it having been a clean trial, I think, must be taken in the context of the fact that he failed to renew a motion for severance, failed to renew a motion, failed to file a Rule 29 motion, failed to submit jury instructions on the issue of knowledge. Those failures, maybe they may have been the result of being in a court with a court who seems to run, as counsel puts it, a tight ship, may be understandable. But they have real-life consequences to my client. And I would ask Your Honor to consider that. Secondly, in counsel's discussion of the evidence and the facts that existed prior to February of 1998, he overlooks the point that I know we typically don't raise on appeal, but I feel constrained to do so here, which is that this is a case in which the person who got the deal was far more culpable on the record than my client. If one reads the closing arguments, it's very evident that Ms. Tokarenko lied in every aspect that one could find. She was trying to protect her daughter, who was a pre-med student and now, I understand, a medical student. The daughter had been involved in the fraud, in the evaluation, in the burglary itself. Ms. Tokarenko was the person who was outside flashing the lights. She was – she – in the world we live in, she got the far better break. Her naturalization was not overturned. My client's was he went to trial. He made that decision. I had no part in that decision, but that's where we are. Lastly, on Blakely, Your Honor, and I apologize not to have thought this out before today, but our position would be that if the Supreme Court were to find Blakely to be retroactive and have an effect on guidelines of cases of this sort, then at least the issue of abuse of trust, which is the two-point adjustment, would be right for consideration by whatever route the Supreme Court determines we are to follow, because that issue was not addressed by the jury below. That was kind of interesting to me. It brings up an interesting point as to whether or not the district court made any additional findings to apply the abuse of trust enhancement. I think, Your Honor, that she did, and that's an excellent question. And if one looks at her rationale, which is set forth in our brief, she talked about how one needs to rely upon the trust that accompanies a self-reporting system, which is the nature of the Medicare or Medicaid billing system, that – I forgot the words exactly, but we can't – we have to rely on people policing themselves. So I think she did make findings. Those findings were not made by the jury. So if Blakely does apply and if it's retroactive, then there would need to be a jury determination on that question. I think on the issue of amount of loss, I think I'd rather submit a brief on this. I suspect that there were evidence submitted to the jury on what the amount of loss was, but there was no specific finding made by the jury. So arguably, if Blakely applies and it's retroactive, then even though the jury considered the question, they made no finding, and so therefore that would need to be considered as well. Thank you. Do you agree with Mr. Winn that Joinder was proper here because the evidence was clearly overlapping? I do not, for reasons stated. I think the overlapping – I think Winn evidence – certainly, let me put it this way. The United States Supreme Court's decision in Schaeffer and other cases have held that when there is some overlapping evidence, that Joinder can be proper because the ruling can be that they are connected together. But this Court, in the Terry decision and other decisions, has been vigilant in not allowing sort of that exception to swallow up the rule, which is what I would argue is the case here. One thing I'm having a little trouble with, let's assume that the district court erred in denying the motion for a severance. Let's assume that, hypothetically, that the court had granted the severance and the trial on the immigration issue had proceeded first. Wouldn't the evidence about the medical fraud have been admissible on that first trial on the immigration? I thought of that as counsel was giving his argument, and I think the answer is, clearly, much of the evidence would have been admitted, but it would have been under the kind of the lens of a trial court exercising its discretion as to what is needed. And certainly, if I may just – I'm sorry. Certainly, counsel would have filed a motion in limine to exclude all the evidence of everything that happened after February of 1998, which was a great deal of the evidence. Now, let's assume that case went to the jury, and the jury found the defendant guilty of the immigration fraud. Would that finding of the jury have a preclusive effect or a collateral estoppel effect on the second trial? That is a great question, and I think it depends upon the elements of the offenses for these other substantive counts and whether they were proven, recognizing there's a money laundering scheme alleged as well. And I guess my final point on this, if the court permits this, is that, in my view, knowledge is a term that must be applied to each crime before the jury. And, indeed, the instruction that was given gave slightly different definitions of knowledge, for example, for the money laundering counts. In our view, I think one of the things that was missed here is that knowledge means something different in the context of these immigration cases because it's not knowledge that I have billed Medicaid improperly. It's knowledge that I am making a false statement, and the strength of the evidence of other criminal behavior may be properly argued by my able-learned friends on the other side to support the inference of knowledge of the false statement. But unlike some of the cases where, for example, I think the Puerta case where the gentleman was making false statements right in front of the immigration officer, that didn't occur here. That's our argument. Your Honor, I hope that I have answered your question. We'll see. Okay, thank you. Thank you very much. Very ably argued on both sides. United States v. Obramoff is now submitted for decision. The next case on our argued calendar this morning.
judges: Alarcon, W. Fletcher, Rawlinson